# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ILYA SMIRNOV, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-1126 (ABJ) |
| | ) | |
| HILLARY RODHAM CLINTON, | ) | |
| Secretary of State, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Congress established the diversity visa program to encourage and facilitate immigration to the United States from countries with historically low rates of immigration. *See* 8 U.S.C. § 1153(c)(1). Each year, the U.S. Department of State ("State Department" or "Department") administers a lottery program where approximately 100,000 randomly-selected "winners" are given the opportunity to apply for "green cards," or permanent residence visas. Lottery winners do not receive the right to immigrate to the United States, but they do receive an opportunity to submit a visa application that will remain valid for the remainder of the fiscal year involved. This is a highly coveted prize, as winners may ultimately qualify for U.S. citizenship, and it provides a means of applying for a visa that does not depend upon sponsorship by an employer or a relative.

In October 2010, over 19 million people submitted entries for the diversity visa lottery for fiscal year 2012. When the results were announced in early May of 2011, it became apparent that more than 90% of the winners had completed their entries during the first two days of the thirty day submission period. The State Department decided to void the lottery results, and it

announced that another lottery would be conducted in July 2011. By that point, about a quarter of the winners had already accessed the website and learned of their selection.

Plaintiffs were among the group who received notification that they had won the right to apply for visas. On behalf of themselves and the entire class of 22,000 individuals who learned of their winning status, they filed this action and a motion for a preliminary injunction seeking to enjoin the defendants from voiding the results of the first lottery and conducting another.[1]

The moving force behind the lawsuit is, as one plaintiff put it, "broken dreams." McBrien Decl. ¶ 13. Plaintiffs have supplied the Court with a collection of impassioned declarations of lottery winners, tracing their path from exhilaration to despair. They write of themselves:

> [T]he 22,000 were and are individuals who played by the rules; individuals who are friends of the United States; who are seeking only to pursue their own American dreams . . .

Plaintiffs' Application for Preliminary Injunction ("Pls.' Memo") at 8.

The Court is sympathetic to the plaintiffs' plight. While it does not doubt that the emotional impact of the Department's reversal has been painful and real, and that many of the plaintiffs have compelling reasons to seek to immigrate to the United States, it must take note of the fact that all of the others who submitted timely petitions during the thirty day period also "played by the rules . . . seeking only to pursue their own American dreams." Pls.' Memo at 8. There are 19 million more stories, from other lottery participants, many of which may be equally or even more compelling, and it is for that reason that Congress determined that every applicant

---

[1] In a telephone conference with the Court on June 30, 2011, the parties agreed to consolidate the hearing on the motion for preliminary injunction with a determination on the merits under Federal Rule of Civil Procedure 65(a)(2). The parties also agreed to defer addressing the class certification issue until the Court has ruled on the merits of the claims of the named plaintiffs. The Court held a hearing on the merits on July 12, 2011.

would have an equal chance of winning the right to apply for the visa. Defs.' Opp. at 2. The Court cannot order the Department of State to honor a botched process that did not satisfy that regulatory and statutory requirements. Moreover, the Court does not find that it was arbitrary or capricious for the Department to decide to rescind a lottery that did not meet the single most important criterion for a drawing: a random selection.

For the following reasons, then, the Court will deny plaintiffs' claims for relief and dismiss the complaint.

## BACKGROUND

### I.        The Diversity Visa Program

The diversity visa program ("DV program") allows eligible immigrants from countries or regions with low admission rates to apply for permanent residence visas to the United States. *See* 8 U.S.C. § 1153(c)(1). The statute delegates the administration of this program to the State Department and authorizes 50,000 diversity visas to be issued each fiscal year. 8 U.S.C. § 1151; Compl.¶ 69.[2] The visas must be issued "to eligible qualified immigrants strictly in a random order established by the Secretary of State for the fiscal year involved." 8 U.S.C. § 1153(e)(2). "Aliens who qualify, through random selection, for a visa . . . shall remain eligible to receive such a visa only through the end of the special fiscal year for which they were selected." 8 U.S.C.§ 1154(a)(1)(I)(ii)(II).

---

[2]        Although the State Department ultimately awards only approximately 50,000 visas, 100,000 winners are initially selected because approximately half do not ultimately meet the eligibility requirements for immigration set forth in the Immigration and Nationality Act ("INA"). Compl. ¶ 92; Defendants' Mem. in Opp. to Plaintiff's Mot. for Prelim. Inj. ("Defs.' Opp.") at 3. Section 1151(e) authorizes up to 55,000 diversity visas each year but another statute requires that 5,000 of those visas be set aside for individuals covered by the Nicaraguan Adjustment and Central America Relief Act of 1997. Interest in the diversity visa program far exceeds the number of visas awarded each year. In 2011, 19 million entries were received for the lottery. Defs.' Opp. at 2 n. 1.

To comply with its statutory requirement to randomly select the recipients of diversity visas, the State Department promulgated regulations creating procedures for conducting a drawing known as the diversity visa lottery ("DV lottery"). The regulations provide in relevant part:

> Entries received during the petition submission period established for the fiscal year in question . . . will be assigned a number in a separate numerical sequence established for each regional area specified in INA 203(c)(1)(F). Upon completion of the numbering of all petitions, all numbers assigned for each region will be separately rank-ordered at random by a computer using standard computer software for that purpose. The Department will then select in the rank orders determined by the computer program a quantity of petitions for each region estimated to be sufficient to ensure, to the extent possible, usage of all immigrant visas authorized under INA 203(c) for the fiscal year in question. The Department will consider petitions selected in this manner to have been approved for the purposes of this section.

22 C.F.R. § 42.33(c).

In accordance with these regulations, then, the State Department was bound to follow a three-step process in administering the DV lottery: numbering, random re-ordering, and selection. To implement this procedure for 2012, a database program first captured and recorded the petitions that were submitted to the State Department's website. Amin. Supp. Decl. ¶ 3. The database program then stored the petitions to a physical location on the hard drives, for the most part in the order in which they were received. *Id*. ¶ 4. However, because of the high volume of petitions received for the lottery – more than one petition per second – the database could not store the petitions in the sequential order in which they were submitted with 100% precision. *Id*. ¶ 5; July 12, 2011 Hearing Transcript ("Tr.") at 30. In some instances, the program "would record the petition in a distant location on the hard drive and leave, temporarily, an empty spot or gap on the hard drive adjacent to where it had recorded the immediately preceding petition." Amin. Supp. Decl. ¶ 5. The database program later filled in the gaps with petitions submitted

later in time than their numerical placement in the database would otherwise suggest. *Id*. ¶ 6. This amounted to approximately 2% of the petitions. Amin Decl. ¶ 5. The program then applied the regional and country limitations specified by the regulations to ensure that all eligible regions of the world were fairly represented. *Id*. ¶ 7. In light of these processes, the system did not number the applications in exactly the order they were received, but the process assigned each application a number, and those numbers substantially mirrored the order in which the petitions were received. *Id*.

According to the regulation, the second step is that that program was supposed to rank-orders the petitions at random using a computer software program designed for that purpose ("the randomizer program"). Amin. Supp. Decl. ¶ 8. Third, the computer program was supposed to select entries based on the rank order determined by the randomizer program. *Id*. ¶ 9.

After the selection is complete, lottery winners must comply with the immigration requirements set forth in the INA, which include payment of visa fees, an interview with the Consulor's Office, and a medical examination, among other requirements. 8 U.S.C. § 1154; Compl. ¶ 81. A consulor officer must then adjudicate the application before the alien receives a diversity visa. *Id*. At the end of this process, nearly half of the original 100,000 lottery winners do not receive a visa. Compl. ¶ 92; Defs.' Opp. at 3.

## II.    The 2012 Diversity Visa Lottery

For the 2012 DV lottery, aliens seeking visas were directed to submit their entries electronically during a thirty-day petition submission period that took place in fall 2010. 22 C.F.R. §§ 42.33(b); 75 Fed. Reg. 60, 846 (Oct. 1, 2010). No paper entries were accepted; the procedure involved the submission of petitions including specified personal information and a

digital photograph to a State Department website. *Id.* These entries make up the pool of applicants for the lottery, which is held in 2011.

The State Department used a new randomizer program for the 2012 DV lottery, which turned out to include an error in the process that "rendered the Randomizer Program ineffective." Amin Supp. Decl. ¶ 10–11. Instead of directing the computer to select the winners as they had been re-ordered and randomized in step two, the computer simply selected the entries in the order in which they were originally numbered. *Id.* ¶ 11. Therefore, the majority of the winners, 98%, were applicants who submitted their entries on October 5 and 6 – the first two days of the submission period. *Id*; Amin Decl. ¶ 9. [3]

Each of the plaintiffs and proposed class members submitted an application to participate in the 2012 DV lottery. Compl. ¶ 83.[4] Between May 1–5, 2011, plaintiffs visited the State Department website and learned that their applications had been selected as lottery winners. Compl. ¶ 84; *see, e.g.,* Decls. of Timilsina, Ibrahim, and Smirnov. The pleadings describe the actions plaintiffs took as a result of learning this information: some plaintiffs, for example, informed their children they would be moving to the United States, quit their jobs, turned down business opportunities, sold land to generate income for the immigration process, or married so that a significant other would be eligible to immigrate. Compl. ¶ 85; Decls. of Maamari and Glim.

---

3     Because the database program did not store the petitions in the precise order in which they were received – saving some early entries in later sections of the database and vice versa – approximately 2% of the winners were entrants who submitted their forms later in the submissions period. Amin Supp. Decl. ¶ 16. And not all of the petitions submitted on October 5 and 6 were selected because some were saved in different parts of the database and because of the regional and country limitations that were applied at the end of step one. *Id.* ¶ 7.

4     The proposed plaintiff class consists of "[a]ll persons selected and notified of their selection in the DV-2012 Lottery during May 2011." Plaintiffs' Motion for Class Certification at 1. The parties estimate that approximately 22,000 individuals would be members of the proposed class. Amin. Decl. ¶ 11.

Within a few days, the State Department learned through public comments that as a result of the previously unknown programming error, the vast majority of the winners had applied on October 5 and 6.[5] Compl. at Ex. 2; Amin Decl. ¶ 9. On May 5, 2011, the State Department cut off access to its website. Compl. ¶ 89; Defs.' Opp. at 6. During the time that the website was available, though, 1,962,931 petitioners viewed the results of the flawed lottery selection, and 22,316 of them learned they were "winners." Amin Decl. ¶ 11. The remaining 78,000 of the original winning entrants did not learn of the results. *See id.*

On May 13, 2011, defendant David Donahue, Deputy Assistant Secretary of State for Visa Services, publicly announced the error in the lottery. Compl. at Ex. 2. The State Department concluded that the skewed results were not "random" and thus violated the statutory requirement that the drawing be conducted randomly. *Id.* ("Regrettably, the results that were previously posted on this website are not valid . . . because they did not represent a fair, random selection of entrants as required by U.S. law.") On May 19, 2011, the State Department sent e-mails to all 2012 lottery participants informing them that the results had been invalidated and a new lottery would occur. *See e.g.,* Compl. at Ex. 3.

## LEGAL FRAMEWORK

### I.     Threshold Issues

#### A. Whether Plaintiffs Have Standing

Before addressing the merits of plaintiffs' claims, the Court will address whether plaintiffs have standing to bring the action at all. "A plaintiff's standing under Article III of the United States Constitution must be determined first in order to establish the jurisdiction of the Court to hear the case . . . [and it] focuses on the complaining party to determine whether the

---

5      The remaining 2% were submitted later in the submission period but due to technical reasons were numbered as if they had been submitted on the first two days. Amin. Decl. ¶¶ 8–9.

litigant is entitled to have the court decide the merits of the dispute or of particular issues." *George v. Napolitano*, 693 F. Supp. 2d 125, 129 (D.D.C. 2010) (internal quotation marks and citations omitted). To establish Article III standing, plaintiffs must demonstrate that "(1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 129–130, quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 180–81 (2000). "Lack of standing is a defect in subject matter jurisdiction." *Id.* at 128–29, citing *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

Plaintiffs contend that they have standing to press their claims because they were duly selected in the lottery and "they will lose a significant opportunity to receive an immigrant visa if the defendants are permitted not to process their immigrant visa petitions and/or treat them as void." Plaintiffs' Reply to Defendants' Mem. in Opp. to Plaintiff's App. for Prelim. Inj. ("Pls.' Reply") at 11. Defendants counter that because the diversity visa lottery did not comply with law, the lottery was void *ab initio* and could not confer any legally protectable interests in plaintiffs. Defs.' Opp. at 8. These arguments are two sides of the same coin, as both depend on a determination of whether the initial lottery was conducted in accordance with the law.

But that is the question to be answered on the merits. As the Seventh Circuit has observed, "it is necessary to distinguish between the court's power to adjudicate the petition and the court's authority to grant relief. *Ahmed v. Dept. of Homeland Security, et al.*, 328 F.3d 383, 386 (7th Cir. 2003). "Only the former necessarily implicates the subject-matter jurisdiction of the court; the latter will depend on whether the statute on which the plaintiff is relying imposes a clear duty on the officer or employee of the United States." *Id.* In this Court's view, the first

question to be resolved is whether the "lost opportunity" of which plaintiffs complain is a sufficiently concrete and actual injury to give rise to standing to sue? While there is some force to defendants' arguments that it is not, the Court will assume that standing exists and proceed to the merits since there is some precedent for assuming jurisdiction over claims brought by would-be immigrants denied an opportunity to apply.

In *Jaimez-Revolla v. Beel*, 598 F.2d 243 (D.C. Cir. 1979), the D.C. Circuit found that even the denial of an application for *permission* to reapply for admission after deportation was enough to confer standing since the plaintiff was "arguably within the zone of interests to be protected or regulated by statute." *Id*. at 246 (citations and quotation marks omitted). The same reasoning would apply to the plaintiffs, who submitted entries pursuant to the diversity visa lottery that was created and is regulated by statute.

*Abboud v. INS*, 140 F.3d 843, 847 (9th Cir. 1998) (superseded in part on other grounds, 8 U.S.C. § 1154), involved a suit for declaratory and injunctive relief after the INS refused to consider a Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa (Relative Petition), which had been filed by the plaintiff's father, separately from his Immigrant Application. The Ninth Circuit concluded that the plaintiff had suffered the necessary injury. *Id*. "Abboud lost a significant opportunity to receive an immigrant visa when the INS denied the Relative Position. This lost opportunity represents a concrete injury to Abboud that is traceable to the INS's conduct and remediable by a favorable decision in this case." *Id*.

Similarly, the Seventh Circuit in *Ahmed* affirmed the district court's denial of a mandamus petition by a lottery winner but it made it clear that it did not base its decision on a lack of standing. 328 F.3d at 384. The court did not specifically address whether the lost chance to apply was an injury in fact, but it noted that the claim was "plausible enough" for jurisdiction

to exist.  *Id.* at 387*; see also Coraggioso v. Ashcroft*, 355 F.3d 730, 733–34 (3d Cir. 2004); *Iddir*

*v. INS*, 301 F.3d 492, 496–98 (7th Cir. 2002); *Keli v. Rice*, 571 F. Supp. 2d 127, 130–31 (D.D.C.

2008); *Gebre v. Rice*, 462 F. Supp. 2d 186, 187–89 (D. Mass. 2006); *Basova v. Ashcroft*, 373 F.

Supp. 2d 192 (E.D.N.Y. 2005) (vacated on other grounds, 383 F. Supp. 2d 390 (E.D.N.Y. 2005).

*See also Mulligan v. Schultz,* 848 F.2d 655, 657 (1988) (finding that the doctrine of "consular

nonreviewability" did not deprive district court of subject matter jurisdiction over aliens' action

challenging consular officers' decision not to accept their applications for immigrant visas).

Finally, while there is case law suggesting that aliens outside the United States do not

have standing to challenge immigration decisions, *see Chinese Am. Civic Council v. Attorney

Gen. of the United States*, 566 F.2d 321, 324 (D.C. Cir. 1977), at least some of the plaintiffs

reside within the United States.  *See, e.g.,* Decls. of Smirnov, Zafirova, Kamil Amin, Timilsina,

and Nikolic. Taken together, these authorities persuade the Court that it is appropriate to assume

standing for the purpose of adjudicating the claims on their merits.

To be clear, this determination is not based on plaintiffs' claimed loss of the right to

immigrate.  The notification of the lottery selection did not confer any right to immigrate – it

simply conferred the right to apply for a visa.  *See* Compl. at Ex. 1 ("Selection does not

guarantee that you will receive a visa . . . .").  Plaintiffs complain about the delay caused by the

rescission and identify what they fear will be an insufficient amount of time for the Department

to approve the visa applications before they expire as an injury that confers standing.  Pls.'

Memo at 17–19.  But as defendants state, "[p]laintiffs have no way of knowing what resources

the State Department and USCIS will allocate to processing DV applications,"  Defs.' Opp. at

10. They do not know now whether the applications will receive timely consideration or not.

Thus, this alleged injury is purely conjectural and does not support standing.  Moreover, even if

the dwindling expiration period could be deemed an injury, an injunction could not provide a remedy because there is no way to recover the lost processing time.

Plaintiffs further claim that voiding the lottery results harmed them because winning the lottery revealed their "intent to immigrate," which may cause them to lose visitors' privileges. Pls.' Memo. at 20–21. This is also not an actual injury. Under the agency's regulations, the plaintiffs demonstrated their immigrant intent when they entered the lottery, and there is nothing about the fortuity of their lottery victory that changed their legal position in that regard. *See* 22 C.F.R. § 42.33. Furthermore, the State Department has assured the Court and the plaintiffs that their temporary notoriety as lottery winners will not inure to their detriment in future matters concerning their status. Tr. at 44. Instead, the Court's decision to hear the claims is based upon the plaintiffs' lost opportunity to have their visa applications – some of which have already been submitted – fully processed and considered.

### B. Whether Plaintiffs' Claims are Ripe

Under the Administrative Procedure Act ("APA"), agency action is ripe for judicial review when "there is no other adequate remedy in a court." 5 U.S.C. § 704. To be final agency action, the action must: (1) "mark the 'consummation' of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature;" and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000), quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948).

Defendants contend that the lawsuit is not ripe because there has been no final agency action. Defs.' Opp. at 13–15. Under their theory, the first lottery was a nullity, so the "consummation" of the lottery will not occur until the State Department completes the second

11

one in accordance with law.  *Id*. at 15.  The Department also contends that any notification to the plaintiffs had no legal effect or consequence because it was the result of the invalid selection process.  *Id*.  As with standing, then, defendants' arguments on the threshold question of ripeness depend upon the strength of their position on the merits.

Defendants' stronger argument regarding ripeness was discussed at the hearing.  Tr. at 25, 46.  There, defendants' counsel agreed with the Court that since plaintiffs will be reenrolled in the second lottery, which has not yet occurred, they do not know whether or not they will be selected as winners.  Tr. at 46.  If any plaintiffs win the lottery a second time, their claims would be moot.  *Id*.  But, as plaintiffs point out, the chances of being reselected in a second lottery are extremely low – according to plaintiffs, approximately two-thirds of one percent.  Tr. at 25.

What neither party addressed in their pleadings on this issue is the fact that some of the plaintiffs who were notified of their winning status promptly took steps to apply for a visa, including paying fees and submitting visa applications, before the Department announced that the lottery had been cancelled.  Pls.' Memo at 6.  Subsequently, the Department indicated that these pending applications will not be processed further.  Compl. at Ex. 3.  In the Court's view, this decision to take no further action on, and in effect, to conclude consideration of, pending applications constitutes final agency action with respect to at least those plaintiffs who submitted applications.  It is a decision with legal effect or consequence.  Because there is a ripe cause of action for at least some of the plaintiffs, the Court will proceed to the merits of the controversy.

## II.     The Claims for Relief in the Complaint

Plaintiffs assert the following claims for relief in their complaint:

### A.   The Mandamus Act and Declaratory Judgment Act

In Count I, plaintiffs seek mandamus and declaratory relief requiring the Department of State to treat their lottery petitions as approved and to process their visa applications in accordance with the statute and the regulations.  Compl. ¶¶ 113–118.

A writ of mandamus is available only when (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff.  *Banks v. Office of Senate Sergeant-at-Arms*, 471 F.3d 1341, 1350 (D.C. Cir. 2006), quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002).

The Declaratory Judgment Act allows a federal court to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).  The statute is a not "an independent source of federal jurisdiction."  *C & E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (quotations and citations omitted).  Rather, the statute merely creates a remedy in cases otherwise within the Court's jurisdiction.  *Id.*

### B.   Statute and Regulations Establishing the Diversity Visa Program

Count II asserts a separate cause of action under the statute and regulations that establish the diversity visa program: 8 U.S.C. § 1153 and 22 C.F.R. § 42.33.  Compl. ¶¶ 119–120. Plaintiffs ask the Court to find that the agency's cancellation of the first lottery violated the statute and the regulations since they do not include an explicit provision permitting rescission. Since the plaintiffs do not provide any authority for the proposition that the statute creates a private cause of action, and defendant does not address this issue, the Court will construe Count

II as part of plaintiffs' fourth claim under the Administrative Procedure Act that the agency's action was not in accordance with law.

C. Administrative Procedure Act

Counts III and IV assert violations of the APA on three grounds. 5 U.S.C. § 706 *et seq*. Plaintiffs ask the Court to "hold unlawful and set aside" the State Department's actions because they are (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law;" (2) "contrary to constitutional right, power, privilege, or immunity;" and (3) "without observance of procedure required by law." *Id*. §§ 706(2)(A)–(D). Plaintiffs ask this Court to hold that the State Department's decision to void the first lottery was arbitrary and capricious, and that the agency will exceed its statutory and regulatory authority if it conducts a second drawing for DV-2012. Compl. ¶¶ 125–126.

The APA establishes the scope of judicial review of agency action. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc*., 435 U.S. 519, 545–549 (1978). The standard of review under the APA is quite narrow.

The Court's analysis of the agency's interpretation of the statute in this case is governed by *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837 (1984). *Chevron* requires the Court to conduct a two-step analysis. First, the Court must determine "whether Congress has directly spoken to the precise question of at issue." *Id*. at 842. Courts "use 'traditional tools of statutory construction' to determine whether Congress has unambiguously expressed its intent," *Serano Labs., Inc., v. Shalala*, 158 F.3d 1313, 1319 (D.C. Cir. 1998), including an examination of the statute's text, structure, purpose and legislative history. *Bell Atlantic Tel. Co. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997). If the Court concludes that the statute is either silent or ambiguous, the second step of the Court's review process is to

determine whether the interpretation proffered by the agency is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

It is true, as plaintiffs point out, that the Supreme Court has "insist[ed] that an agency examine the relevant data and articulate a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009) (internal quotation marks omitted), quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). But in making such a determination, "considerable weight" is generally accorded to "an executive department's construction of a statutory scheme it is entrusted to administer[.]" *Chevron*, 467 U.S. at 844. Indeed, "under *Chevron*, courts are bound to uphold an agency interpretation as long as it is reasonable – regardless of whether there may be other reasonable or, even more reasonable, views." *Serano*, 158 F.3d at 1321. And the Court must defer to an agency's reading of its own regulations unless it is "plainly erroneous or inconsistent with the regulation." *Id.* at 1320 (internal quotation marks omitted).

D. Due Process Clause of the U.S. Constitution

Count V alleges that the State Department's decision to void the results of the DV lottery violates the Due Process Clause of the U.S. Constitution. To succeed on a due process claim, a plaintiff must show that there was a cognizable liberty or property interest at stake. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Courts have determined that there is no property right in an immigrant visa. *See United State ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("[A]n alien who seeks admission to this country may not do so under any claim of right. . . . [It] is a privilege granted by the sovereign United States Government."). Nor do aliens also have a constitutionally-protected interest in the procedures by which such visas are obtained. *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104

F.3d 1349, 1353 (D.C. Cir. 1997). Because plaintiffs withdrew their due process claim at the hearing on July 12, 2011, *see* Tr. at 27, the Court will not address Count V further.[6]

E. Injunctive Relief

Count VI seeks a permanent injunction but fails to identify the precise nature of the injunctive relief that is sought. Compl. ¶¶ 135–138.[7] The standard for granting a permanent injunction is much like the standard for a preliminary injunction, and the Court is required to consider four factors: (1) success on the merits; (2) whether the movant will suffer irreparable injury absent an injunction; (3) the balance of hardships between the parties; and (4) whether the public interest supports granting the requested injunction. *See Nichols v. Truscott*, 424 F. Supp. 2d 124, 143 (D.D.C. 2006). Unlike a preliminary injunction, actual success on the merits is required to obtain permanent injunctive relief. *Id*. Thus, plaintiffs' fifth claim for relief is entirely dependent upon the other claims.

## ANALYSIS

In their claims seeking a declaratory judgment, mandamus, and injunctive relief, as well as their APA claims in Count IV, plaintiffs ask the Court to order the Department to recognize their lottery victory and to process their visa applications. In other words, they assert that the law *requires* the Department to honor the May lottery results. As plaintiffs agreed at the hearing on July 12, any authority to order the Department to act could only arise from a lottery that was conducted in accordance with law. Tr. at 14.

---

6     Plaintiffs' decision to concede their constitutional argument would also eliminate the third ground for relief under the APA.

7     Plaintiffs alternatively ask the Court to order the Department to select no more than 78,000 additional names in the second lottery, Pls.' Memo. at 26, propose that the Department approve 122,000 petitions this year (adding the plaintiffs to the winners of the second lottery), Compl. ¶ 92, and seek to restrain the Department from holding a new lottery altogether. Compl. at 44 (prayer for relief).

In the claim they seek to bring under the statute (Count II), the injunction action, and the APA claims in Count III, plaintiffs assert that the law does not permit the Department to rescind the original results and conduct a new lottery, or at least, that it does not permit the Department to redo the lottery in a manner that would not include them among the winners.

Given the substantial overlap among the various claims, the Court will address these two legal issues that underlie all of them: first, was the original lottery conducted in accordance with law? If not, plaintiffs are not entitled to mandamus, declaratory, or injunctive relief. And second, can the State Department legally start over? If so, the APA claims and the remainder of plaintiffs' claim for injunctive relief must be denied. The Court concludes that since the original lottery did not comply with the statutory and regulatory requirements, it cannot order the Department to process the original winners' applications. It further concludes that the Department's decision to conduct a second lottery in compliance with law was neither arbitrary nor capricious, and that it was based on a reasonable interpretation of the statute and the agency regulations. Therefore, the second lottery may proceed as planned.

## I.      Was the Original Lottery Conducted in Accordance with the Law?

The Court finds that the May lottery did not comport with either the statute or the regulations. The statute provides:

> Immigrant visa numbers made available under subsection (c) of this statute (relating to diversity immigrants) shall be issued to eligible immigrants strictly in a random order established by the Secretary of State for the fiscal year involved.

8 U.S.C. §1153(c). Thus, the requirement that the State Department issue diversity visa numbers "in a random order" is mandatory ("shall"). And Congress underscored that it was insisting upon random selection when it chose to modify the term with the word "strictly."

The May lottery did not approve the petitions in a strictly random order. In fact, it did not approve them in a random order at all. Plaintiffs' attempts to characterize the results of the flawed process as random make a hash of the statute and defy common sense.

Plaintiffs argue that their selection was random if one employs "a straightforward dictionary definition." Compl. ¶ 10. They cite an online dictionary ("Merriam-Webster defines 'at random' or 'random' as 'without definite aim, direction, rule or method.'), Compl. ¶ 105, and they provide the Court with an Oxford English Dictionary definition: "having no definite aim or purpose; not sent or guided in a particular direction; made, done, occurring, etc. without method or conscious choice, haphazard." *Id.,* citing http://en.wikipedia.org/wiki/Randomness. But Congress was not using the term in casual conversation. The statutory provision was written to govern a complex numerical selection process – the manner in which a small group of petitioners would be selected from a pool of millions in a computerized drawing of international significance – and so in that context, the term can only be interpreted in the sense of a technical process.

This conclusion is bolstered by the fact that the word random is not used in isolation, but it is part of the phrase "random *order*," a term used in probability and statistics and computer science. 8 U.S.C. §1153(c). The statute is not satisfied by a result that can ultimately be characterized as random; rather, it calls for a process – the random re-ordering of the data.

The Department's chief information officer to consular affairs and director of consular systems and technology defines it this way:

> [A] random sequence is one in which the numbers in the sequence are generated as if they were independent draws from a well-mixed vessel where each number is represented once in the vessel. This random process embodies qualities of unpredictability and equal probability. In other words, the 'random' rank-ordering of a list is a term of art that requires specialized software that generates

numbers that are mathematically proven to be without any definite aim, direction, rule or method. Amin. Supp. Decl. ¶ 12.

Also, in the statute, "random" is preceded by the word "strictly." According to the Oxford English Dictionary, "strictly" means: "rigorously, stringently; with insistence on exact performance, execution, or obedience," or "with rigid or exact adherence to a plan, regulation, etc."[8] Since the Court is required to give equal meaning to all of the words in the statute, *see Negonsott v. Samuels*, 507 U.S. 99, 106 (1993), it cannot find that Congress directed the Secretary of State to select visa lottery winners in a manner that was "strictly haphazard" or "strictly without purpose." Rather, the Court concludes that Congress plainly intended "strictly random" to call for rigid adherence to the statistical definition: "governed by or involving equal chances for each of the actual or hypothetical members of a population."[9] This is the principle that accords legitimacy and fairness to any lottery.[10] Since here, the overwhelming majority of the petitioners did not have any chance of being selected, the process was not random.

---

8      *See also* http://www.merriam-webster.com/dictionary/strictly ("stringent in requirement or control" or "rigorously conforming to principle or a norm or condition."

9      *See, e.g.,* Oxford English Dictionary Vol. 13 at 168 (2d ed. 1989) ("1938 *Jrnl. R. Statist. Soc.* CI 147 In colloquial speech the word 'random' is applied to any method of choice which lacks aim or purpose; and this usage is also found in certain sciences. In statistics, however, the word has a somewhat different and more definite significance, closely related to probability . . . 1975 R.B. Ellis *Statistical inference* ii. 17 What counts is making sure that the sample really is random, that at any time any item in the population has as much chance of being chosen as any other item in the population.") *See also* Webster's Third New Int'l Dictionary 1880 (3d ed. unabridged 1981) (defining "random" as "involving or resulting from randomization" or "having the same probability of occurring as every other member of a set").

10     This is how the agency interpreted the law and it is specifically what individuals who submitted entries to the visa lottery were assured would take place. The Notice placed in the Federal Register by the State Department promised: "All entries received during the registration period will have an equal chance of being selected within each region." 75 Fed. Reg. 60846-02, 60851 (Oct. 1, 2010).

       And plaintiffs' own exhibits reflect that there were people who understood the term in the statistical sense at the time. *See, e.g.,* Compl. at Ex. 4, 5/17/2011 Letter from Kenneth White

Even if the Court were to adopt plaintiffs' currently preferred definition, it would not find the selection to be random. According to plaintiffs, their lottery results were valid if they were made "without definite direction" or without "rule or method." But here, the selection did have a definite rule or method, and it was "guided in a particular direction" – the applications were selected in the same order in which they were originally numbered, which was largely based on when they were received. Amin Supp. Decl. ¶¶ 4–6. More importantly, they were overwhelmingly skewed such that 98% of the petitioners who were selected were people who had applied during the first two days of the thirty day submission period. Amin. Decl. ¶ 9. Given this pattern that characterized the results, even if the pattern was not 100% perfect, the selection cannot be described as "random."

Plaintiffs assert that since the results were not the result of any deliberate *human* design, they must be deemed to be random, but that is a gloss not found in either dictionary. The Court need not find that the lottery results were improperly or purposefully manipulated by someone in particular to conclude that they were not "random."

Indeed, according to the plaintiffs, the fact that a computer was involved carries the day without more: "a computer error . . . cannot be equated with non-randomness." Compl. at 39. Counsel for plaintiffs elucidated this theory at the hearing, claiming that if a computer error produces a list of names – any names – then the list must be random since it was "without

---

(counsel for plaintiffs) to The Hon. David Donahue, Deputy Assistant Secretary of State for Visa Services (May 17, 2011) ("Thank you for considering and acting upon my letter to the Visa Office of May 10, 2011, highlighting errors in the way the Department of State processed the DV-2012 Lottery drawing, resulting in the selection not being properly randomized."); Pls.' Memo at Ex. 2, Miriam Jordan and Alexandra Berzon, *A Losing Ticket in the American Lottery*, Wall St. J., June 25, 2011 at 7 "(On May 2, 2011, one user of a popular immigration message board wrote, 'I'm from Ukraine and didn't win . . . All winners filled their forms on 5 or 6 of October (mostly fifth). No winners of later dates . . . 'random' selection looks very strange.'").

purpose" and "haphazard." Tr. at 20. In essence, plaintiffs are arguing that their selection was random simply because no one knew it was going to happen. This interpretation of random is utterly inappropriate in this context, and it cannot be squared with the language of the regulation, which expressly defines randomness in terms of a functioning computer program.[11] And it does not comport with the statute and Congress's use of the word "strictly." Congress was not calling for exactitude in happenstance, but rather the rigorous enforcement of the rules of random selection.

---

[11] Plaintiffs ignore the fact that in computer science, "randomness" is a term of art. Amin Decl. ¶ 8. There are countless mathematicians, statisticians, and computer programmers who have made a life's work out of deriving the algorithms that will generate a random selection, as well as designing programs that test the actual randomness of the results. They do this because there are many fields for which random number generation is essential.

For example, in gambling, state statutes specify the need for randomness in slot machines and other gaming devices. Miss. Admin. Code 13-1-3:IV § 5(c) provides: "All gaming devices submitted for approval must use a random selection process to determine the game outcome of each play of a game. The random selection process must meet 95 percent confidence limits using a standard chi-squared test for goodness of fit." The law includes a definitions section: "'Randomness' is the observed unpredictability and absence of pattern in a set of elements or events that have definite probabilities of occurrence." Miss. Admin. Code 13-1-3: IV §1(n).

Similarly, *Griggs v. Harrah's Casino*, 929 So. 2d 204, 209 (La. Ct. App. 2006), a witness with degrees in accounting and management, information systems and computer science, and electrical engineering "explained that gaming machines are heavily regulated by the states and must meet strict standards of quality so that the machines are random, are fair to the players, and comply with the applicable state law requirements for gaming machines. [He] explained that a jackpot from a slot machine is determined through the process of random number generation, which means that a computerized system that has been programmed to select numbers at random determines whether a jackpot is won . . . If a malfunction occurs and the random numbers are not selected by the computer, there can be no jackpot. Therefore, to verify whether or not a jackpot has been won, an independent gaming laboratory may be used to confirm the jackpot by analyzing the computer microprocessor from the slot machine where the jackpot was allegedly won."

Surely the statute at issue here ("strictly random") and the regulations ("rank-ordered at random by a computer using standard computer software for that purpose") direct that the important diversity visa lottery be conducted with similar exactitude, and the suggestion that a computer error alone would satisfy the legal requirements does not merit serious consideration.

Finally, the statute does not simply call for the selection of the winners in "random order," but rather, the random order "established by the Secretary of State." "[W]hen Congress has explicitly or impliedly left a gap for an agency to fill, there is a delegation of authority to the agency to give meaning to a specific provision of the statute by regulation, 'and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary and capricious in substance, or manifestly contrary to the statute.'" *Atl. City Elec. Co. v. FERC,* 295 F.3d 1, 9 (D.C. Cir. 2002), quoting *United States v. Mead Corp.,* 533 U.S. 218, 227 (2001). So, the statute must be read in conjunction with the Department's implementing regulations that give it meaning.

Plaintiffs' reading of the text of the regulation is even more strained than their interpretation of the statute, and a close reading of the regulation makes it even more clear that the Court cannot grant the relief plaintiffs seek. Plaintiffs insist that their applications should be processed because, under 22 C.F.R. §42.33(c), the Department is required to select petitions for each region "in the rank orders determined by the computer program." They say that since the order in which their names came up was in fact "determined by [the State Department's] computer program," their lottery victory must stand. Pls.' Reply at 2. They then point to 8 U.S.C. § 1153 and 22 C.F.R. §42.33(b), which provide that approved petitions remain valid until the end of the fiscal year for which they were approved, and they argue that the State Department is therefore legally obligated to treat their petitions as valid. Pls.' Memo at 19.

But plaintiffs read the regulation quite selectively, and they focus on only one sentence instead of the three that describe what is supposed to take place. Section 42.33(c) begins by setting forth the requirement that the petitions be "numbered" based on the order of receipt. It then provides:

> Upon completion of the numbering of all petitions, all numbers assigned for each region will be separately rank-ordered at random by a computer using standard computer software for that purpose.[12] 22 C.F.R. § 42.33(d).

It is only after that step takes place that the regulations permit the selection to proceed. The regulations provide: "The Department will then select *in the rank orders determined by the computer program* a quantity of petitions for each region." *Id.* § 42.33(c) (emphasis added). But that did not happen. The computer program simply selected the names in the same order in which they had originally been numbered. Amin Decl. ¶ 7; Amin Supp. Decl. ¶ 11. This was a blunder of enormous proportions, with worldwide repercussions, and it caused grief, frustration, disappointment, and anger around the globe, but the Court cannot ignore what took place. Under those circumstances, the Court cannot find that the May lottery was conducted in compliance with the law.

Plaintiffs insist that their selection is valid in any event since it was performed by the Department's computer. Reply at 2; *see also* Pls.' Resp. to Supp. Decl. at 5 ("[T]he process was computer generated.") But the mere fact that the list of names was derived from some computer program is not enough to fulfill the regulation because the word "separately" in the second sentence of the regulation must be enforced. The fact that the Department is bound to "separately" rank order the petitions, and "then select in the rank order determined by the computer program" means that a second sort must take place, and the petitions selected must be selected in that new order, which has to be a different order from their original numerical order. And when the third sentence of the regulation says, "[t]he Department will then select 'in *the* rank order determined by *the* computer program,' is it referring to the command in the second

---

12      It is clear beyond any doubt that at this point, the agency is not using the word "random" as it might be used colloquially or first defined in a dictionary. The State Department regulations specifically call for random ordering "by a computer using standard computer software for that purpose," in other words, utilizing a computerized random number generation process.

sentence that "all numbers assigned for each region will be separately rank-ordered at random by a computer using standard computer software for that purpose," not any selection performed by the State Department computer. 22 C.F.R. § 42.33. Since the computer omitted the second step and instead selected the petitions based on their original numerical order, the Department did not "select in the rank orders determined by the computer program."[13]

---

[13] Plaintiffs take issue with the declarations submitted by the Department's information technology specialist. They complain that they are inconsistent and that they cannot be credited because Amin said in his first declaration that the petitions were numbered sequentially "as they were received," but the data plaintiffs gathered includes anomalous instances where that did not happen. Pls.' Reply at 9. Plaintiffs also assert that Amin's statement that the petitions were selected in the order in which they were numbered is undermined by the fact that several individual entrants who applied during the first two days were not selected. *See* Pls.' Resp. Supp. Decl. For the reasons described in more detail below, the Court does not find the declarations to be inconsistent or unworthy of belief. More importantly, the Court points out that whether the petitions were numbered exactly in the order in which they were received is not determinative. There was a problem with the lottery even if the winning petitions were only selected in the order in which they were numbered and not in the precise order in which they were received: they were supposed to be randomly re-ordered after they were numbered.

Amin's first declaration began with a general overview of the situation, and he did state that the petitions were sorted into regions and numbered "according to the order that they were received." Amin Decl. ¶ 4. Due to the exigencies caused by the huge volume of entries, that was not the case for 100% of the entries, but even in the first declaration, Amin provided more detail that refined his broad introductory statement. In paragraph 5, he explained that the computer utilizes database optimization processes which led to the inclusion of later filed petitions – approximately 2% – in the numbering system. In other words, even in the first declaration, Amin made it clear that the numbering system was not perfectly sequential and that it was affected by data optimization.

The second declaration was more detailed, but not inconsistent. Amin explained that what the data optimization he referred to in the first declaration means is that some entries were moved to the hard drive when they came in, which took them *out* of the numbering sequence, and later entries were moved up to fill the gaps, which placed them *in* the numbering sequence although they were received later. Amin Supp. Decl. ¶¶ 5–6. He also explained that the selection process required the computer to take account of how many petitions had been selected from each region, which also led to the non-selection of some entries from the first two days. Amin Decl. ¶ 7.

Amin has declared under penalty of perjury that the petitions were selected in the order in which they were numbered, Amin Decl. ¶ 7; Amin Supp. Decl. ¶ 11. In light of his more detailed explanation, the fact that some people who applied on October 5 or October 6 were not selected does not negate that assertion. Plaintiffs suggest that it is "quite possible" that there were more non-selectees from the first two days than simply the 2% that were filled in from later

Plaintiffs correctly assert at several points in their pleadings that the Department is bound to follow its own regulations, *see* Pls.' Memo at 11, citing *Service v. Dulles,* 354 U.S. 363, 372 (1957), and the failure to follow this essential provision in the regulations mandated by Congress invalidates the May lottery results.

Similarly, section (d) of the regulation provides that it is "petitions approved pursuant to paragraph (c)" that remain valid until the end of the fiscal year. 22 C.F.R. § 42.33(d). But if the critical step described in paragraph c – the selection according to the separate, random re-ordering – did not take place, the petitions were never approved "pursuant to paragraph (c)," and they are not subject to the terms of paragraph (d). So plaintiffs' argument that the statute and the regulations require the processing of their applications must fail.

---

dates, Pls.' Response to Supp. Decl. at 2, but the Court cannot base its findings on sheer speculation.

Plaintiffs also assert that Amin's description of how the petitions were originally numbered – which was not always in accordance with the order in which they were received – means that they were sorted to some extent even at the initial stage. Pls.' Resp. Supp. Decl. at 3–4. This "shaking up," they say, supports their position that the ultimate selection was "random." *Id.* But plaintiffs do not dispute the existence of the fundamental problem that prompted the agency to act – the fact that the overwhelming majority of the entries selected were submitted on what plaintiffs call the "lucky days." *Id.* And Amin's explanation is entirely consistent with that outcome. In the Court's view, that circumstance alone rendered the lottery invalid under both the statute and the regulations, because both called for a "random" selection. The fact that, according to Amin, there was a failure to comply with the regulation's requirement that the selection be based on the second, separate sort, and not the original numbering of the petitions, is a second, independent basis for the Court's determination that the lottery did not comport with the regulation, or with the statute's requirement that the selection be based upon a random order "established by the Secretary."

Plaintiffs also devoted a considerable portion of their reply to their claim that Amin's explanation of what took place should not be believed because it could not be squared with what was known about the average daily number of entries. *See* Pls.' Reply at 6–7. However, plaintiffs informed the Court that a further review of the data eliminated that particular objection to the conclusions in the declaration. Pls.' Supp. to Pls.' Reply [Dkt. #12].

The Court cannot overlook the utter failure of the State Department's computer program to perform the function for which it was intended and say, as plaintiffs suggest, the results were still random in some sense of the word: 22,000 individual names came out of a machine, they are not related in any particular way, and there was no improper manipulation of the data by them or by the people at the State Department. Compl. ¶ 9; Pls.' Resp. Supp. Decl. at 4–5. Even if, as plaintiffs claim without any particular statistical analysis, the class of 22,000 is a representative sample of the broad spectrum of applicants of diverse backgrounds and nationalities, *see* Pls.' Resp. Supp. Decl. at 4, and even if, as they state repeatedly, they played by the rules and it wasn't their fault, the Court cannot order the State Department to recognize legally flawed results.[14]

Since the Court has determined that it lacks legal grounds to order the State Department to process plaintiffs' applications or to reinstate their approved status, and therefore, the claims for a declaratory judgment, writ of mandamus, and injunction must fail, the next question to be determined is whether the court can overturn the Department's decision to redo the lottery under the Administrative Procedure Act. Plaintiffs argue both that the decision is arbitrary and capricious and that it was not made in accordance with law.

## II.      Was the State Department's Decision to Redo the Lottery Arbitrary and Capricious or Not in Accordance with Law?

"A reviewing court shall set aside agency action, findings, and conclusions found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Mead,* 533 U.S. at 229, quoting *Chevron*, 467 U.S. at 842–45. The Court concludes that the State

---

14      *See National Hospital Serv. Soc'y v. Jordan*, 128 F.2d 460, 460 (D.C. Cir. 1942) (holding that a court cannot mandate a government to continue to honor a permit issued not in accordance with the law).

Department's action was not arbitrary and that it was grounded in a reasonable interpretation of the statute and agency regulations. Thus, the second lottery may move forward as planned.

The Court's review of the State Department's decision should be "highly deferential." *Bloch v. Powell*, 348 F.3d 1060, 1070 (D.C. Cir. 2003). This deference is particularly appropriate in cases such as this one, where the agency's decision is "based on the evaluation of complex scientific information within the agency's technical expertise." *Sanofi-Aventis U.S. LLC v. FDA*, 733 F. Supp. 2d 162, 171 (D.D.C. 2010), quoting and citing *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (emphasizing that "considerable deference" must be shown because courts "review scientific judgments of the agency not as the chemist, biologist, or statistician that we are qualified neither by training or experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.") Therefore, courts may only set aside agency action under the APA if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

The Court has already determined that the first lottery was not conducted in accordance with law because that it failed to satisfy the most important element of the statute: randomness. Upon discovering this information, it was certainly reasonable and not arbitrary for the State Department to start over. In fact, according to plaintiffs' own papers, many individuals were calling upon the Department to take action to rectify the situation. *See* Compl. ¶ 88 ("On information and belief, during the first few days of May 2011, the Department of State became

aware that a substantial number of winners had submitted their petitions on October 5 and 6, 2010. At about this time, there was public concern about the skewing of results with calls for an investigation amidst allegations that the results were not random and the computer program was hacked or manipulated.");[15] Compl. ¶ 91 ("The backlash from around the world was immediate and dual-edged. Initially, media reports highlighted the negligent manner in which the Lottery was held . . . "); and Pls.' Memo at Ex. 2 at 7 ("On May 1, reports of the lottery selection began to pour in on a popular immigration message board, forums.immigration.com. By that evening, members – many of whom hadn't been chosen – began to post comments saying that most people who had won applied over the course of just two days . . . . State Department officials say that, as such evidence accumulated in online forums, they started to investigate."). It is also clear from plaintiffs' own papers that those who were concerned, including counsel for the plaintiffs, fully expected the Department to act. *See* Compl. at Ex. 4, counsel's letter written after the Department's announcement. ("Thank you for considering and acting upon my letter to the Visa Office of May 10, 2011, highlighting errors in the way the Department of State processed the DV-2012 Lottery drawing, resulting in the selection not being properly randomized.").

The State Department official who oversees the visa program publicly explained the agency's decision:

> These results are not valid because they did not represent a fair, random selection of entrants as required by U.S. law. Although we received large numbers of entries every day during the 30-day registration period, a computer programming error caused more than 90% of the selectees to come from the first two days of the registration period . . . . Because this problem unfairly disadvantages many Diversity Visa Lottery entrants, we will conduct a new, random selection.

---

15    The public calls for action included blog posts by and an email from Kenneth White (speaking on his own behalf before he represented the plaintiffs in this action) to the State Department on May 10, 2011. [Dkt. #14] ("Does the Department plan to address publicly the fact that the overwhelming majority of DV-2012 selectees submitted their entries on October 5 and 6, 2010?").

Compl. at Ex. 2.  This Court can hardly conclude that the Department's decision to act in a way that would be equally fair to every applicant is arbitrary and capricious.[16]

This conclusion is bolstered by a point made by counsel for the State Department at the hearing.  In determining the most appropriate remedy for the flawed lottery, the State

---

[16]     Plaintiffs argue that the agency has not proffered a sufficient factual basis for its determination, which they contend "runs counter to the evidence before the agency."  Pls.' Reply at 10, citing *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658 (2007) and *Motor Vehicle Mfrs. Assn.,* 463 U.S. at 43.  This contention is based upon the arguments addressed in note 14, *supra,* that the numbering system was not 100% sequential, and that Amin's declarations do not adequately explain why some individuals who submitted their entries on the first two days were not selected.  The Court concludes, based on the information provided in the Amin declarations, that the agency's decision was factually supported.  This conclusion is not altered by information showing that the original numbering was not entirely sequential; the fact that the computerized process resulted almost entirely in the selection of entries from the first two days of the submission period was enough alone to provided substantial and reasonable grounds for the agency to act.

In connection with plaintiffs' reply, the Court points out that on June 30, 2011, it ordered that the consideration of the motion for preliminary injunction be consolidated with the consideration of the case on the merits pursuant to Fed. R. Civ. P. 65(a)(2).  Consent of the parties was not required, but the parties agreed to the Court's decision of how to proceed.  The Minute Order from that date also reflects, "the parties have indicated that they do not intend to call live witnesses at the hearing," but the Court accorded them additional time to think about it and indicated that any requests to introduce live testimony could be submitted up to July 8.  *See* L. Cv. R. 65(d).  No requests were filed, and plaintiffs did not request an opportunity to cross-examine Kirit Amin, even though they received his declaration on July 6.  Instead, they utilized their reply to the defendants' opposition to their motion to attack his conclusions.  At the hearing, when the Court extended the defendants an opportunity to supplement the Amin declaration, plaintiffs sought to rescind their consent to the consolidated hearing, claiming that they should be afforded an opportunity to cross examine Amin at a separate trial on the merits.  Tr. at 50.  The Court ruled that the matters would remain consolidated pursuant to Rule 65.  Thereafter, defendants submitted Amin's supplemental declaration [Dkt. #12], and the Court granted plaintiffs' motion for leave to file a response [Dkt. #15].  Thus, the record reflects that it was plaintiffs who elected not to seek live testimony, but in any event, the Court considered the substance of plaintiffs' concerns about both declarations before it made its decision.  Moreover, even if the matters had not been consolidated, and the action on the merits had been permitted to proceed, in all likelihood it would have been resolved, like most APA cases, through the consideration of cross motions for summary judgment, which also involve evidence presented by declaration rather than live testimony.  *See* Fed. R. Civ. Proc. 56(c); L. Cv. R.7(h) and (n).  Finally, the Court notes that the belated request to bifurcate the proceedings was inconsistent with the concerns repeatedly expressed by the plaintiffs – which the Court took seriously – that every day of delay reduces the number of lottery winners whose applications will be processed before they expire.  *See, e.g.,* Pls.' Reply at 20.

Department was bound to balance the interests of the 22,000 individuals who were aware of the lottery results and the 19 million other disappointed entrants, who may have equally compelling reasons for wanting to immigrate to the United States.  Tr. at 39.  Counsel pointed out that in many of the countries served by the diversity visa lottery, a computer is not easy to come by and internet service is not widely available.  Thus, the Department had assured applicants around the world that it would not favor those who were able to submit their entries first, and it took that fact into consideration in deciding what to do.  Defendants' counsel told the Court:

> [N]o matter what day they applied . . . if they couldn't get to a computer with Internet on [the first day of the submission period], it didn't matter.  That at the end or in the middle of the process, everything would be randomized and that would be a fair process they could count on.  We considered the promises we made to all 19 million people. Tr. at 39.

Since the Court agrees with the State Department's conclusion that the results were not random as that term is used in the statute or the regulation, then the only question remaining is whether the government adopted a reasonable plan to remedy the error.[17] And if the first lottery was invalid, plaintiffs' only argument for insisting that their victory should stand boils down to the fact that they found out about it. [18]  That itself is something of an arbitrary circumstance,

---

17  Plaintiffs also recognize that the Department was faced with making a choice among competing options. As they put it: "The Department has concluded that it made an error in not running a randomization program; the Department concluded that it made an error in publicizing the results.  But rather than 'making right' by these 22,000 individuals, it has decided to throw the baby out with the bathwater . . . . Yet the Department has and has had alternatives, enabling it to protect the interests of all parties, including the 22,000: there is nothing in the statute or regulations prohibiting the conduct of a second Lottery.  There is nothing in the statute or regulations capping the number of selectees." Pls.' Resp. Supp. Decl. at 6.

18  Indeed, while plaintiffs' proposed alternative meets their own concerns, it does not advance the interests of the other 78,000 first lottery winners, who, if plaintiffs are correct in their legal theory – which they say is based only on the law and not grounded in reliance or estoppel – are equally entitled to relief.  In other words, plaintiffs themselves are making policy choices from an array of options, balancing competing interests in a manner with which

favoring entrants already in the United States or residing in more highly developed communities. Plaintiffs present many arguments for why as a matter of policy or fairness the Department should have fashioned a solution that took account of their interests.[19] But weighing competing policy alternatives and substituting its judgment for that of the agency is exactly what this Court is not permitted to do.

Although there may have been different policy choices the Department could have made, its decision is reasonable and certainly conforms to "certain minimal standards of rationality." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 520–521 (D.C. Cir. 1983) (internal citations and quotation marks omitted). The Court cannot and will not second-guess a reasonable policy decision made by the Department after balancing the competing interests of all of the stakeholders. Thus, the Court finds that the State Department's actions were not arbitrary or capricious or outside the scope of its authority under the APA.

In their second and fourth claims for relief, plaintiffs also argue the Department acted outside the scope of its authority by voiding the results because the statute does not expressly permit rescission. Pls.' Memo. at 11. While it is true that the statute does not expressly address this situation, it does explicitly empower the Department to administer the lottery and promulgate regulations, 8 U.S.C. §§ 1153–54, and in particular, it directs the Secretary to implement its call for issuance of visas "strictly in a random order." *Id.* § 1153(e)(2). When a statute is silent or ambiguous with respect to "the precise question at issue," as it is here, the second step under the *Chevron* framework directs the Court to determine whether the agency's

---

reasonable people might agree or disagree. The Court is not permitted to join them in this exercise.

19      Of course, if it had, the Court in all likelihood would now be facing a class action on behalf of the other 19 million complaining about that.

interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

As the Supreme Court explained in *Mead,* 533 U.S. at 229:

> This Court in *Chevron* recognized that Congress not only engages in express delegation of specific interpretive authority, but that "[s]ometimes the legislative delegation to an agency on a particular question is implicit.". . . Congress, that is, may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which "Congress did not actually have an intent" as to a particular result . . . When circumstances implying such an expectation exist, a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise . . . but is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable.

(citations omitted). The Court concludes that it was reasonable to interpret the statute as granting inherent authority to void a lottery that did not comply with the law. This decision is therefore entitled to deference by this Court. *See Teva Pharms., USA, Inc. v. Leavitt*, 548 F.3d 103, 106 n.1 (D.C. Cir. 2008).

Moreover, it appears that plaintiffs have retreated from their initial claims, and they acknowledge the scope of the Department's authority. They state in their response to the Supplemental Declaration: "there is nothing in the statute or regulations prohibiting the conduct of a second Lottery." Pls.' Resp. Supp. Decl. at 16.

Therefore, plaintiffs' claims do not give rise to relief under the Administrative Procedure Act. This also means that there are no grounds for the issuance of declaratory or injunctive relief.

### III.    Plaintiffs' Claim for an Injunction

As with a preliminary injunction, the Court is required to consider four factors when evaluating a request for a permanent injunction: (1) success on the merits; (2) whether the

movant will suffer irreparable injury absent an injunction; (3) the balance of hardships between the parties; and (4) whether the public interest supports granting the requested injunction. *See Nichols v. Truscott*, 424 F. Supp. 2d 124, 143 (D.D.C. 2006). If the movant has no likelihood of success on the merits, inquiry into the remaining factors is unnecessary, for the injunctive relief must be denied on that ground alone. *Trudeau v. FTC,* 456 F.3d 178, 182 n. 2 (D.C. Cir. 2006). Because the Court has determined that plaintiffs cannot succeed on the merits of their claims, they are not entitled to injunctive relief. *NBC-USA Housing, Inc., Twenty-Six v. Donovan*, No. 09-2245, 2011 WL 1204759, at *28 (D.D.C. Mar. 31, 2011).

The plaintiffs have devoted a substantial portion of their pleadings to making the court aware of the hardships that they face, and they lay them at the feet of the State Department. They specifically advised the Court at the hearing that they have relinquished their claims based in estoppel or reliance, but they continued to sound those themes in subsequent pleadings. *See* Pls.' Resp. Supp. Decl. at 6 ("Surely it was not Congress's intent to have disqualified 22,000 individuals for what amounts to self-acknowledged government misfeasance.").[20]

At bottom, plaintiffs are asking the Court to find that the unfortunate lottery transformed their desire to immigrate into a right to immigrate.

> The opportunity to immigrate to the United States represents increased access not merely to educational and economic opportunities but in many cases political freedoms which will accrue not merely to the plaintiffs' benefit but to those of their children, both now and to be born, and are often the culmination of a lifetime of hoping and waiting.

---

[20] Plaintiffs cite *INS v. Paunescu*, 76 F. Supp. 2d 896 (N.D. Ill. 1999), for this proposition. In *Paunescu,* the INS was ordered to process diversity lottery winners' timely visa applications. The government had let them languish for over two years despite plaintiffs' submission of the necessary materials, and in the face of a court order entered before the expiration of the fiscal year. But in that case, there was no question raised concerning the validity of the plaintiffs' selection.

Memo. at 19- 20. *See also* Pls.' Resp. Supp. Decl. at 6. ("[T]he Department has decided to attempt to utilize a hypertechnical 'escape hatch,' an escape hatch that would allow it to shirk its own responsibility and instead wreak havoc and utter devastation on 22,000 individuals, as well as their children and future children.")  But no such right was conveyed with the lottery notifications, and it is not something a court can confer.  *Coraggioso*, 355 F.3d at 732.  *See also Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990).

The declarations submitted by plaintiffs contain heartfelt stories of dashed hopes and shattered expectations, and they detail the steps they took "in reliance on the selection letter." Pls.' Memo at 6–7; Decls. of Nikolic, Zafirova, and Kuate.  They insist that they acted in good faith and did nothing wrong, both of which may be true.  But as the cases cited in plaintiffs' memorandum reflect, courts have consistently recognized that they are not necessarily empowered to relieve would-be immigrants from the profound frustration and disappointment that the process can create, such as when visa applicants were unable to seek review of adverse decisions before their eligibility expired.  *See e.g., Masaru v. Napolitano,* 619 F.3d 545, 551 (6th Cir. 2010); *Mohamed v. Gonzales,* 436 F. 3d 79, 81 (2d Cir. 2006).  It is not enough to point to governmental "mis"feasance to prevail in a claim of equitable estoppel against the government; plaintiffs would have to demonstrate some sort of affirmative misconduct on the part of State Department officials.  *Morris Comm'n, Inc. v. FCC,* 566 F.3d 184, 191 (D.C. Cir. 2009).  *See also Keli,* 571 F. Supp. 2d at 127 (holding that mandamus petition filed by diversity lottery winner was deemed moot because the time had expired; government was not estopped even though an official "promised" the plaintiff that his application would be granted).

**CONCLUSION**

For all of the reasons set forth above, after thorough consideration of the pleadings, the exhibits attached to the pleadings, the arguments of counsel at the hearing, the material submitted to the court after the hearing, and all of the proceedings in this case, the Court will deny plaintiffs' claims for relief and dismiss the complaint. The motion for certification of the class will be denied as moot. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: July 14, 2011